# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ALEX POLLOCK,

                    Plaintiff,

          v.                                    Case No. 18-CV-107

MANPOWERGROUP US, INC,

                    Defendant.

# DECISION AND ORDER

## 1. Facts

According to plaintiff Alexander Pollock, certain hiring managers at Dell and Exxon were overtly racist when it came to the employees they sought to hire. Experis, a division of Manpowergroup US, Inc. (Manpower), who recruited candidates for Dell, Exxon, and many other companies, allegedly sought to accommodate the biases of the hiring managers by referring only white candidates. Pollock, who started working for Experis as a recruiter in February 2016 (ECF No. 55, ¶¶ 1, 3) complained of this practice. He alleges he suffered retaliation as a result.

In May 2016 Pollock submitted an anonymous internal complaint reporting that he was informed that the Dell hiring manager[1] wanted someone "white." (ECF No. 55, ¶ 11.) He included a screenshot from the Dell account which included the statement, "In the past this manager has looked for diversity in the team which is mostly composed of Indians." (ECF No. 55, ¶ 10.) Manpower did not materially investigate this complaint. (ECF No. 55, ¶ 14.)

In July 2016 a co-worker of Pollock made a complaint reporting that leaders on the Dell team told recruiters to look for candidates of a certain skin color and gender. (ECF No. 55, ¶ 15.) When recruiters verbally challenged this directive, a manager responded that maybe they were working in the wrong industry. (ECF No. 52, ¶ 14.) Additionally, it was Pollock's understanding that recruiters were to submit only candidates who had "pronounceable" last names and no visa restrictions. (ECF No. 52, ¶ 16.) Manpower investigated this complaint and concluded it was unsubstantiated. (ECF No. 55, ¶ 22.)

In late-August 2016 Pollock was moved off the Dell account. (ECF No. 55, ¶ 27.) According to one of the managers who made the decision to transfer Pollock, he was transferred because he consistently made mistakes in processing candidates. (ECF No.

[1] It is often unclear whether a particular person, for example, "this hiring manager" (ECF No. 55, ¶ 11), worked for Manpower or a client of Manpower. Aside from persons the court identifies as a "hiring manager," it is the court's understanding that all other persons identified herein as a manager or supervisor were employed by Manpower / Experis.

55, ¶ 30.) Pollock was assigned to a team where he recruited engineering professionals for a variety of clients. (ECF No. 55, ¶¶ 35, 39.)

In September of 2016 the Exxon client account director, Grace Graham, called Pollock and requested that he assist on the Exxon account. (ECF Nos. 52, ¶ 20; 55, ¶ 46.) The account director told him that Exxon's hiring manager would not be interested in any non-white candidates and that Pollock should consider "white candidates only." (ECF Nos. 52, ¶ 20; 55, ¶¶ 46-47.) The next day, Pollock reported to his supervisor, Kristin Ellis, the instruction he received from Graham. (ECF No. 55, ¶ 48.) Graham's conversation with Pollock was audio-recorded, and Pollock provided the recording to Ellis. (ECF No. 55, ¶ 49.) The following day Ellis told him that he no longer would be working on the Exxon account. (ECF No. 55, ¶ 54.) This was reportedly because of problems with Pollock failing to submit candidates in accordance with proper procedures. (ECF No. 55, ¶¶ 57-61.) Pollock was transferred to the Best Buy account. (ECF No. 52, ¶ 56.)

Pollock had repeated problems in terms of productivity and professionalism, as well as on technical matters. (*See, e.g.*, ECF No. 55, ¶¶ 65, 66, 67, 73, 75, 76, 77, 78.) On December 5, 2016, Manpower placed him on a performance expectation plan. (ECF Nos. 52, ¶ 38; 55, ¶¶ 71-72.) In mid-February 2017, Pollock's supervisor met with him to discuss his performance issues. (ECF No. 55, ¶ 84.) During this meeting Pollock brought up the complaints he made in May and September and the similar complaint his co-

worker made in July 2016; Pollock expressed his belief that Ellis was retaliating against him. (ECF No. 55, ¶¶ 86-87, 92.) Pollock's supervisor called in a representative from human resources, who asked Pollock to provide additional information about his complaints. (ECF No. 55, ¶¶ 88-89.)

Manpower then investigated these complaints. (ECF No. 55, ¶¶ 92-93.) The investigation resulted in Manpower concluding that Graham had violated company policy. As a result, Manpower terminated her employment. (ECF No. 55, ¶ 96.) Ellis, to whom Pollock initially made this complaint, received a written warning for not doing more to address Pollock's concerns. (ECF No. 55, ¶ 97.) The investigation, which ended in early March 2017, was unable to substantiate Pollock's claim of retaliation. (ECF No. 55, ¶¶ 98, 100.)

Dissatisfied with this outcome, Pollock said he did not want to work under Ellis anymore. (ECF No. 55, ¶ 35.) He was out of the office for the next couple of weeks as a result of previously scheduled time off, illness, and requests to work from home. (ECF No. 55, ¶¶ 103, 106, 107.) When he returned on March 24, 2017, Pollock was informed he was being transferred to the Accenture account. (ECF No. 55, ¶ 108.) On March 31, 2017, Pollock sent an email to his supervisor that he was satisfied with the account he was on. (ECF No. 55, ¶ 119.)

A few days later, on April 3, 2017, Pollock's supervisor met with him to discuss issues about Pollock leaving work early and problems in his records. (ECF No. 55, ¶¶ 124, 125, 129, 130.)

Pollock did not return to work after April 5, 2017. (ECF No. 55, ¶ 136.) He informed his supervisors that he was "negotiating by his lawyer's side." (ECF No. 55, ¶ 137.) Manpower approved paid administrative leave on April 10, 2017, for Pollock to explore mediation of his claims. (ECF Nos. 52, ¶ 83; 55, ¶ 138.) On April 22, 2017, "Manpower gave Pollock the option to take severance or return to work." (ECF No. 55, ¶ 139; *but see* ECF No. 50, ¶ 9 (Pollock denying Manpower provided him "with a severance offer").) Pollock did not return to work (ECF No. 55, ¶ 140), and on May 23, 2017, Manpower treated his refusal to return to work as a resignation (ECF No. 55, ¶ 140).

## 2. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it "might affect the outcome of the suit" and a dispute is "genuine" only if a reasonable factfinder could return a verdict for the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). In resolving a motion for summary judgment, the court is to "construe all evidence and draw all reasonable inferences from the evidence in" favor of the non-

movant. *E.Y. v. United States*, 758 F.3d 861, 863 (7th Cir. 2014) (citing *Gil v. Reed*, 535 F.3d 551, 556 (7th Cir. 2008); *Del Raso v. United States*, 244 F.3d 567, 570 (7th Cir. 2001)). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and [in] opposition to the motion for summary judgment." *White v. City of Chi.*, 829 F.3d 837, 841 (7th Cir. 2016).

### 3.  Analysis

#### 3.1. Parties' Proposed Findings of Fact

The court's task in reviewing Manpower's motion has been needlessly complicated by the inappropriate and inattentive way both parties, but particularly Pollock, have presented and responded to the proposed findings of fact.

By his own admission, Pollock submitted an incomplete response to Manpower's proposed findings of fact. (ECF No. 53.) He has moved to correct his response to three of Manpower's proposed facts. (ECF No. 53.) This motion is granted as unopposed. (*See* ECF No. 56.)

However, this correction did not address the most significant problems in Pollock's responses. Many of Pollock's responses to Manpower's proposed findings of fact state that the fact is "Disputed." But Pollock's response often does not suggest a genuine dispute of the proposed fact. Sometimes he does not address the proposed finding of fact; other times the purported dispute is unrelated to the proposed fact. (*See, e.g.*, ECF No. 55, ¶¶ 28, 73.) And still other times, while purporting to dispute the fact,

he actually concedes it. (*See, e.g.*, ECF No. 55, ¶¶ 84, 94.) Pollock's "disputes" often amount to no more than adding details to Manpower's proposed fact. Sometimes Pollock simply offers those additional details without even stating whether he disputes or admits the proposed fact. (*See, e.g.*, ECF No. 55, ¶¶ 78, 80, 99, 120.) To the extent that the court recounts any such "disputed" facts here as, in fact, undisputed, it reflects the court's conclusion that Pollock has failed to demonstrate that the proposed finding of fact is "genuinely disputed." *See* Fed. R. Civ. P. 56(c)(1) and (B).

Insofar as Pollock's responses offer additional information rather than merely showing the existence of a genuine dispute as to Manpower's proposed finding of fact, that additional information is disregarded. Any additional proposed findings of fact must be presented only in accordance with Civ. L.R. 56(b)(2)(B)(ii), which ensures that the moving party is able to appropriately respond to the proposition. As to any proposed finding of fact to which Pollock did not respond (*see, e.g.*, ECF No. 55, ¶¶ 64, 66-67, 118), the fact is deemed admitted for purposes of Manpower's motion. *See* Fed. R. Civ. P. 56(e)(2).

There are also numerous problems with the additional proposed findings of fact submitted by Pollock. In his summary judgment brief Pollock states, "All of the facts in this case are contained in the Plaintiff's Statement of Undisputed Fact and Plaintiff's Response to Defendant's Statement of Undisputed Facts, filed herewith and referenced as if set forth herein with full particularity." (ECF No. 47 at 1.) It is unclear what Pollock

intends with this statement. To the extent it is intended to suggest that the court must consider every statement in his additional proposed findings of fact and in his response to Manpower's proposed findings of fact as if they were a part of his brief, the notion is rejected. That is not how summary judgment works. It is not the court's role to scour the record for facts that might support a party's position, much less make a party's factual argument for it. *See Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) ("The district court was necessarily limited to arguments presented in [the plaintiff]'s opposition brief. After all, 'a lawsuit is not a game of hunt the peanut. Employment discrimination cases are extremely fact-intensive, and neither appellate courts nor district courts are obliged in our adversary system to scour the record looking for factual disputes….'" (quoting *Greer v. Bd. of Educ.*, 267 F.3d 723, 727 (7th Cir. 2001))). It is each party's obligation to make a specific assertion and support it with a citation to a proposed finding of fact, which in turn is supported by a citation to appropriate evidence.

Pollock also inappropriately combines multiple factual propositions into a single numbered paragraph. As a rule of thumb, each numbered paragraph should consist of a single sentence stating a single proposed fact, although sometimes it may take more than one sentence to propound a single fact. By the court's tally, Pollock offers more than 130 separate proposed facts, far in excess of the 100 permitted under the court's Local Rules, *see* Civ. L.R. 56(b)(2)(B)(ii).

When a party exceeds the 100-fact limit without leave, some judges will strike or disregard any fact in excess of the 100-fact limit. *See, e.g.*, *B.B & M. v. Appleton Area Sch. Dist.*, No. 12-C-115, 2013 U.S. Dist. LEXIS 107392, at *6 (E.D. Wis. July 31, 2013) ("The court will therefore limit its consideration to Plaintiffs' first 100 statements of fact ….") Alternatively, the court could order Pollock to submit new proposed facts that comply with the 100-fact limit. *See Howard v. Schrubbe*, No. 15-cv-557-pp, 2017 U.S. Dist. LEXIS 122943, at *5-7 (E.D. Wis. Aug. 4, 2017). However, the court can overlook non-compliance with its Local Rules. *See* Gen. L.R. 1. The court will do so here because, had Pollock sought leave to submit additional proposed findings of fact in excess of the 100 permitted, the court likely would have granted such leave.

Additionally, in his brief Pollock cites to "PSUF" and "PSOF." He explains that "PSUF" refers to "Plaintiff's Statement of Undisputed Facts 'PSUF'" (ECF No. 48). (ECF No. 47 at 6.) He does not identify what "PSOF" might refer to. Thus, the court presumes he mistakenly uses "PSUF" and "PSOF" interchangeably.

In addition, throughout his brief Pollock attempts to support his assertions with citations to wholly irrelevant or non-existent facts. For example, a couple of times in his brief he cites to "PSUF ¶ 91" (ECF No. 47 at 6, 10), but there is no paragraph 91 in Plaintiff's Statement of Undisputed Facts. (ECF No. 48.) As an example of Pollock citing to a fact that is wholly unrelated to the stated proposition, he states, "The Accenture account was where various struggling recruiters or brand-new recruiters were placed.

(PSOF ¶ 62)." (ECF No. 47 at 7.) The cited proposed fact, paragraph 62, states, "In his February 2017 meeting with Mr. Finney, Mr. Pollock again brought up the May 2015 complaint about the Dell account, the September 2016 complaint about Ms. Graham, and the July 2016 complaint about Mr. O'Sullivan and the other managers of the Dell account." (ECF No. 48 at 62). This error was repeated numerous times throughout Pollock's brief.

Despite these many challenges, the court forged ahead and eventually figured out what appears to have happened. The court surmises that Pollock at some point when preparing his proposed findings of fact deleted one numbered paragraph, thus changing the numbering from that point forward. However, he failed to update the citations in his brief. There is no indication that Manpower was prejudiced by Pollock's incorrect citations. Although Manpower noted several other problems with Pollock's documents, it did not note this defect. In the absence of prejudice, the court will consider the facts it believes Pollock intended to cite rather than just those he actually cited.

### 3.2. Timeliness

A charge of retaliation must be filed within 300 days of the alleged retaliation. Pollock alleges that in late August 2016 he was transferred from the Dell account in retaliation for his complaint of discrimination. (ECF No. 55, ¶ 27.) It was not until July 10, 2017, that he filed an unperfected charge of discrimination with the EEOC (ECF No.

55, ¶ 144), and not until September 7, 2017, that he filed a perfected charge with the EEOC (ECF No. 55, ¶ 145). Even considering his unperfected charge, his charge was filed more than 300 days after he was transferred from the Dell account. Therefore, Manpower argues, any claim regarding this transfer is untimely.

Pollock responds that his claim regarding the Dell transfer is timely because on June 12, 2017, he filled out an "Intake Questionnaire." (ECF No. 47 at 5.) An "Intake Questionnaire" may constitute a charge for statute of limitations purposes if it contains a request for the agency to act. *Fed. Express Corp. v. Holowecki*, 552 U.S. 389, 405 (2008). Following *Holowecki*, the EEOC revised its intake questionnaire form so that it now asks the complainant to check one of two boxes. *Beverly v. Abbott Labs., Inc.*, No. 12 C 03216, 2014 U.S. Dist. LEXIS 197433, at *12 (N.D. Ill. Mar. 25, 2014). The first says, "I want to talk to an EEOC employee before deciding whether to file a charge. I understand that by checking this box, I have not filed a charge with the EEOC. I understand that I could lose my rights if I do not file a charge in time." (ECF No. 50-1 at 4.) The second box states:

> I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

(ECF No. 50-1 at 4.) If the complainant checks the second box, the intake questionnaire will constitute a charge for purposes of the statute of limitations. *Beverly*, 2014 U.S. Dist. LEXIS 197433, at *13. Pollock checked the second box. (ECF No. 50-1 at 4.)

The parties do not identify the exact date of Pollock's transfer. They say only that it occurred in "late August." (ECF No. 55, ¶ 27.) Pollock's claim would be untimely only if his transfer occurred before August 16, 2017 (*i.e.*, more than 300 days before Pollock submitted the intake questionnaire on June 12, 2017). An event occurring before August 16 could not be accurately described as "late August." Consequently, Manpower has failed to demonstrate that Pollock's claim regarding his transfer from the Dell account is untimely.

### 3.3. Retaliation

"To survive summary judgment on his Title VII retaliation claim, [the plaintiff] must show that a reasonable jury could find that he engaged in a protected activity, that he suffered an adverse employment action, and that the adverse action was motivated by a protected activity." *Smith v. Ill. DOT*, 936 F.3d 554 (7th Cir. 2019). The plaintiff must show that the "retaliatory motive was the but-for cause of an adverse employment

action." *Appleton v. City of Gary*, No. 19-1440, 2019 U.S. App. LEXIS 22578, at *8 (7th Cir. July 30, 2019) (unpublished).[2]

Courts used to speak in terms of "direct" or "indirect evidence" and "convincing mosaic" and a plaintiff's obligation to proceed under the "direct" or "indirect methods" of proof. The Court of Appeals for the Seventh Circuit largely cast aside this body of case law in *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016). However, the Court of Appeals has continued to refer to the "direct" and "indirect" methods as two different ways of "proving a *prima facie* retaliation claim," noting that "each requires proving different elements," *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018); *see also Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 472 (7th Cir. 2018). The "indirect" method of proof has not been abandoned at least insofar as it refers to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See McDaniel v. Progress Rail Locomotive, Inc.*, No. 18-3565, 2019 U.S. App. LEXIS 30229, at *16 (7th Cir. Oct. 9, 2019); *Rozumalski v. W.F. Baird & Assocs.*, 937 F.3d 919, 926 (7th Cir. 2019); *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); *see also Fields v. Bd. of Educ.*, 928 F.3d 622, 625 (7th Cir. 2019) ("The framework established by *McDonnell Douglas*

---

[2] Pollock quotes *Culver v. Gorman & Co.*, 416 F.3d 540, 545 (7th Cir. 2005), to assert, "A motivating factor does not amount to a but-for factor or to the only factor, but is rather a factor that motivated the defendant's actions." (ECF No. 47 at 7.) But he later quotes *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 n.1 (7th Cir. 2014), to say, "[T]he protected activity of an employee making a retaliation claim must have been a but-for cause of the alleged adverse action by the employer." (ECF No. 47 at 9 (internal quotation marks omitted)). Only *Carlson* is the correct statement of the law following the Supreme Court's holding in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013) ("The text, structure, and history of Title VII demonstrate that a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer.").

*Corp. v. Green*, 411 U.S. 792 (1973), has not been 'displaced ….') (citing *Ferrill v. Oak Creek-Franklin Joint Sch. Dist.*, 860 F.3d 494, 499-500 (7th Cir. 2017)).

This significant shift in the language of retaliation claims has posed various problems for courts, particularly when parties continue to frame their arguments using the abandoned terminology, as Pollock has done. In fact, Pollock does not cite a single case that post-dates *Ortiz*. It is not necessarily error for a plaintiff to use the antiquated language in arguing why he believes there is evidence that could lead a reasonable jury to find that the adverse action was motivated by a protected activity. But, regardless of how the parties frame their arguments, the court must be mindful that the "direct" or "indirect" methods or a "convincing mosaic" reflect not elements of the claims but are at best mere guides to assess the ultimate question of whether a reasonable jury could find that the plaintiff would not have suffered the adverse employment action but for his protected activity.

### 3.3.1. Adverse Employment Action

A plaintiff must present evidence from which a jury could find that he suffered an adverse employment action because he took actions protected under Title VII. "An adverse employment action is 'some quantitative or qualitative change in the terms or conditions of [the plaintiff's] employment that is more than a mere subjective preference." *Madlock v. WEC Energy Grp., Inc.*, 885 F.3d 465, 470 (7th Cir. 2018) (quoting *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003)). A wide variety of

actions might constitute an adverse employment action. *See Herrnreiter v. Chi. Hous. Auth.*, 315 F.3d 742, 743-45 (7th Cir. 2002) (discussing various categories of adverse employment actions). But an adverse employment action will commonly involve changes to the plaintiff's "current wealth, his career prospects, or changes to work conditions that include humiliating, degrading, unsafe, unhealthy, or otherwise significant negative alteration in the workplace." *Madlock*, 885 F.3d at 470 (quoting *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016)); *Vance v. Ball State Univ.*, 646 F.3d 461, 473 (7th Cir. 2011) (quoting *Sitar v. Ind. DOT*, 344 F.3d 720, 727 (7th Cir. 2003)) (noting that an adverse employment action may include "a change of work responsibilities, 'depend[ing] on how much of a change, and how disadvantageous a change, took place'"). "In order to succeed, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse.'" *Vance*, 646 F.3d at 473 (quoting *Lapka v. Chertoff*, 517 F.3d 974, 985 (7th Cir. 2008)).

In his response, Pollock contends that he suffered adverse employment actions "when Manpower transferred him to a series of increasingly lower positions and then terminated his employment." (ECF No. 47 at 6.) Because the only allegedly adverse employment actions he addresses in his response to Manpower's motion are his "termination" and transfers—specifically, transfers from the Dell account to an engineering team, to the Best Buy account, and finally to the Accenture account (ECF

No. 47 at 6-7)—the court does not consider whether any other action might have constituted an adverse employment action.

### 3.3.1.1.    Constructive Discharge

The court starts at the end—Pollock's alleged termination—which he refers to as "[t]he final 'adverse employment action'…." (ECF No. 47 at 7.) However, this assertion is unsupported by any citation to a proposed finding of fact. Pollock was placed on paid administrative leave on April 10, 2017. (ECF No. 55, ¶ 138.) On April 22, 2017, "Manpower gave Pollock the option to take severance or return to work." (ECF No. 55, ¶ 139; *but see* ECF No. 50, ¶ 9 (Pollock denying Manpower provided him "with a severance offer").) When Pollock did not return to work, on May 23, 2017, Manpower treated his failure to return as a resignation of his position. (ECF No. 55, ¶ 141.) Thus, it is undisputed that Pollock's employment with Manpower ended not because Manpower refused to continue to employ him but because Pollock refused to return to work. In other words, Pollock quit.

Pollock argues, "In reality, Manpower utterly failed to properly address Mr. Pollock's complaints of discrimination and retaliation, which would have allowed him to return to work." (ECF No. 47, ¶ 13.) Pollock alleges that Manpower failed to diligently investigate his complaints and, faced with inaction and in the absence of assurances that the "retaliation against him for reporting discrimination would stop," he had no other option but to resign. (ECF No. 47 at 13-14.) Although Pollock never uses

the term or cites to relevant authority, it sounds like Pollock is arguing that he was constructively discharged.

Constructive discharge "occurs when the plaintiff shows that he was forced to resign because his working conditions, from the standpoint of the reasonable employee, had become unbearable." *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010) (citing *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)); *see also Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 628 (7th Cir. 2019) ("Constructive discharge requires an employee prove her working conditions were so intolerable that she was forced into involuntary resignation."). There are two broad forms of constructive discharge. One is when it is clear that the employee is about to be terminated and quits instead. *See Chapin*, 621 F.3d at 679 (quoting *Eeoc v. Univ. of Chi. Hosps.*, 276 F.3d 326, 332 (7th Cir. 2002)). There is no hint that this is the sort of constructive discharge Pollock may be attempting to allege.

The other form of constructive discharge occurs when an "employee resigns due to alleged discriminatory harassment. Such cases require a plaintiff to show working conditions even more egregious than that required for a hostile work environment claim because employees are generally expected to remain employed while seeking redress, thereby allowing an employer to address a situation before it causes the employee to quit." *Chapin*, 621 F.3d at 679 (citing *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009); *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 789-90 (7th Cir. 2007)).

No evidence has been presented from which a reasonable jury could find that Pollock was subject to unendurable working conditions. Even under Pollock's characterization of the facts, the adversity he suffered was that he was assigned to less-desirable accounts. That is a far cry from the unbearable working conditions needed to demonstrate constructive discharge. *Cf. Hunt v. Wal-Mart Stores, Inc.*, 931 F.3d 624, 629 (7th Cir. 2019) (discussing cases where harassing sexual conduct was found insufficient to create a triable issue as to constructive discharge) (citing *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 528 (7th Cir. 1993) (affirming summary judgment for defendant on a constructive discharge claim where plaintiff alleged her supervisor rubbed her upper leg several times, kissed her without consent, and lurched at her as if to grab her after hiding behind some bushes); *Roby*, 579 F.3d at 785 (finding no constructive discharge when a co-worker made sexually suggestive remarks, pressed his body against plaintiff's backside, put his arm around her, patted her on the buttocks, and pushed plaintiff by the hips); *Koelsch v. Beltone Elecs. Corp.*, 46 F.3d 705, 708 (7th Cir. 1995) (affirming summary judgment for defendant where supervisor removed his shoe and suggestively rubbed his foot against plaintiff's legs under the table, grabbed plaintiff's buttocks, told plaintiff he found her attractive and that he was unable to control himself around her, and asked plaintiff to go out with him); *Gleason v. Mesirow Fin.*, 118 F.3d 1134 (7th Cir. 1997) (no hostile work environment claim where supervisor referred to female customers as "bitchy" and "dumb," spoke about the size of female

employee's breasts, told a female employee that he liked her in tighter skirts, and told plaintiff he dreamed about holding hands with her); *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 902 (7th Cir. 2004) (no actionable harassment where harasser referenced plaintiff's "tits," commented that plaintiff was attractive and had nice legs, used profanity, made comments about his penis size, and commented that a female coworker needed to have sex); *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 431 (7th Cir. 1995) (no sexual harassment where supervisor commented on plaintiff's looks, made grunting noises at her, indicated he was lonely, and made gestures intending to suggest masturbation)).

It is true that an employer's inaction or insufficient action in response to complaints of unlawful conduct are a frequent, if not necessary, component of a constructive discharge claim. *See Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 790 (7th Cir. 2007). However, Pollock has not presented any authority for the notion that alleged inaction to complaints alone, absent evidence of other circumstances that make his continued employment unbearable, will support a finding of constructive discharge. Rather, an employee must face extremely adverse working conditions *and* the employer must have failed to resolve the employee's complaints before a claim of constructive discharge may be found. *See Boumehdi*, 489 F.3d at 790. Because no reasonable finder of fact could conclude that Pollock's working conditions were unendurable, Manpower is entitled to summary judgment on his constructive discharge claim.

### 3.3.1.2.  Transfers

It is undisputed that Manpower transferred Pollock to different accounts. However, a transfer is not necessarily an adverse employment action. It must involve "a *significant* alteration to the employee's duties, which is often reflected by a corresponding change in work hours, compensation, or career prospects." *Stephens v. Erickson*, 569 F.3d 779, 791 (7th Cir. 2009) (emphasis in original). Rather than objective details, Pollock tends to offer only his subjective view that each transfer was "undesirable" and to "increasingly lower positions." (ECF No. 47 at 6.) In support of these assertions he cites to "PSUF ¶ 91," which, in light of the error in Pollock's numbering, the court has determined corresponds to number 90 of his statement of proposed facts. (ECF No. 48.)

Proposed finding of fact number 90 is Pollock's most egregiously compound proposed fact, containing what should have been split into more than a dozen separate proposed findings of fact. Included amidst the many statements in the proposed finding is the following: "This retaliation caused Pollock an even further degradation of responsibility and loss of pay than what he had suffered from the first retaliatory transfer from Dell to engineering." (ECF No. 52, ¶ 90.) For present purposes, the court focuses on three words: "loss of pay." (ECF No. 52, ¶ 90; *see also* ECF No. 52, ¶ 56.)

Manpower asserts several objections to this proposed finding of fact. First, it says that "the statements are conclusory and unsupported by specific facts, which is

insufficient to generate a genuine issue of material fact on summary judgment." However, the proposed finding is supported by Pollock's declaration that largely tracks the proposed fact and includes the statement that the transfers resulted in a "loss of pay." (ECF No. 50, ¶ 12.) ("Loss of pay" in this context presumably means Manpower decreased Pollock's pay rather than stopped paying him. But either would be an adverse employment action.) This statement is one within Pollock's personal knowledge and, therefore, appropriate under Fed. R. Civ. P. 56(c)(4). Although Manpower objects to the declaration on the basis that it is a "sham affidavit," it does not point to any portion of Pollock's deposition testimony that is inconsistent with his statement that his transfer resulted in a "loss of pay."

Manpower says that it "further objects to the remaining fact statement as needlessly compound and repetitive." (ECF No. 52, ¶ 90.) The statement certainly is "needlessly compound," as the court has noted. But Manpower does not develop any argument as to what the court should do as a consequence. To the extent Manpower implies that the court should disregard the proposed finding of fact(s), it cites no authority that says the court should do so.

Finally, Manpower states, "Defendant has disputed the remaining material elsewhere in the summary judgment materials." (ECF No. 52, ¶ 90.) But as the court noted with when it chided Pollock for attempting to incorporate into his brief all of his proposed findings of fact and his responses to Manpower's proposed findings of fact, it

is not the court's role to search out what Manpower might be referring to. The court has not located, either in Manpower's briefs or in its response to Pollock's proposed findings of fact, where Manpower has disputed Pollock's assertion that his transfers resulted in a "loss of pay." Nor is Pollock's assertion that he suffered a "loss of pay" obviously inconsistent with any of his other proposed findings of fact or a fact proposed by Manpower that he admitted or failed to dispute.

There is evidence that Pollock's position remained the same throughout his transfers. (ECF No. 49, ¶¶ 37, 49.) But even if the court were to assume that this is evidence that his salary also remained unchanged, that does not mean that his overall "pay" did not change. Pollock was, in part, compensated by way of commission. (*See* ECF No. 52, ¶¶ 8, 51, 57.) Although the court lacks details as to the commission structure, there is evidence that a recruiter's net commission may have varied depending on the client. (ECF No. 52, ¶ 8 ("The larger the gross profit percentage the lager [sic] the commission …."). Of course, a "loss of pay" after a transfer could be explained by facts having nothing to do with a demotion. For example, commission was based on placements, and the number of placements varied month-to-month. (*See* ECF No. 52, ¶¶ 37, 46.) Thus, Pollock may have experienced a "loss of pay" that was only temporary, or he may have experienced a similar "loss of pay" even if he had not been transferred. Manpower, however, has not demonstrated that any "loss of pay" was attributable to such an explanation.

In sum, the court finds that, for purposes of summary judgment, it must accept Pollock's assertion that his transfers resulted in a "loss of pay." His proposed finding of fact refers to a "further loss of pay," thus suggesting that he suffered a loss of pay both when he was transferred from the Dell team and as well as when he was transferred to the Best Buy team. Although under certain circumstances a "loss of pay" might not be significant enough to constitute an adverse employment action, the court has no basis to so conclude here. Consequently, the court finds that a reasonable finder of fact could conclude that Pollock's transfers to an engineering team and later to the Best Buy account resulted in an adverse employment action in the form of a loss of pay.

Pollock, however, has not demonstrated that his transfer to the Accenture account resulted in a "loss of pay" or was otherwise an adverse employment action. He offers only his subjective view that Accenture was an "unsuccessful account and a significant step down." (ECF No. 52, ¶¶ 60, 61.) He does not provide objective evidence to support these assertions.

### 3.3.2. Causation

Pollock's evidence connecting his protected activity to his transfers is sparse. Although the relevant section of his brief spans roughly five pages, it is comprised largely of a recitation of case law rather than a discussion of the relevant facts. (ECF No. 47 at 7-12.)

As to his transfer from the Dell account, Pollock has failed to present evidence from which a reasonable finder of fact could conclude that the managers who decided to transfer him even knew of his protected activity. (ECF No. 55, ¶ 29.) Broadly construing his protected activity up to that point as encompassing (a) his anonymous complaint, (b) Pollock and his co-workers verbally challenging a manager's directive in a meeting, and (c) assisting a co-worker to write a complaint, there is no evidence that his managers knew of any of this. As to the two written complaints, Pollock's role in them was concealed. And as for his verbal objection, there is no evidence that any of the decision-making managers were present in the meeting or were otherwise informed of Pollock's objection.

One manager offered a declaration stating that, at the time of their decision to transfer Pollock off of the Dell account, "[w]e were not aware" of Pollock's complaints. (ECF No. 42, ¶ 3; *see also* ECF No. 55, ¶ 29.) Granted, this manager can assert only what she knew and not what she believes her colleagues knew. But there is no evidence that the other two decision-makers were aware of Pollock's protected activity.

It is true that Pollock testified that he believed that the managers who made the decision to transfer him off of the Dell account "didn't like the way that our interactions ended up feeling sort of awkward at times due to my dissatisfaction with the -- the way that they were imposing sort of some of these discriminatory recruiting practices on me and the rest of the team." (ECF No. 38 at 27, 98:23-99:3.) But this testimony is supported

only by his own speculation as to what the managers knew. Just as one manager cannot baldly assert what her colleagues knew, Pollock cannot assert (at least not without foundation) what his supervisors knew. And Pollock does not offer such a foundation for his testimony.

If the decision-makers did not know of Pollock's protected activity, their decision to transfer him off of the Dell account could not have been in retaliation for the protected activity. Consequently, Manpower is entitled to summary judgment on Pollock's claim that he was transferred from the Dell account in retaliation for his protected activity.

The court, however, must deny Manpower's motion for summary judgment with respect to Pollock's transfer to the Best Buy account. Pollock offers the following proposed fact: "As a result of his complaints, Mr. Pollock was moved onto the Best Buy account …." (ECF No. 52, ¶ 66.) Manpower objects to this statement as "conclusory and unsupported by specific facts." (ECF No. 52, ¶ 66.) Nonetheless, Manpower states, "Notwithstanding the objection: Undisputed solely for the purpose of summary judgment." (ECF No. 52, ¶ 66.) Thus, the court must accept this statement as admitted. Civ. L.R. 56(b)(4). Having admitted that Pollock was transferred to the Best Buy account "as a result of his complaints," Manpower is not entitled to summary judgment on Pollock's claim that the transfer to the Best Buy account was an adverse employment action in retaliation for his protected activity.

Finally, as to Pollock's transfer to the Accenture account, as the court noted above, Pollock has failed to show that this transfer was an adverse employment action. The claim fails also because Pollock has not demonstrated a causal connection between this transfer and his protected activity.

Pollock argues that the suspicious timing of the transfer shows a causal connection between his protected activity and this transfer. (ECF No. 47 at 11.) But Pollock never identifies, either in his brief or in the proposed findings of fact he cites in his brief, when he was transferred to the Accenture account.

Manpower, however, provides that date—March 24, 2017. (ECF No. 55, ¶ 108.) That was 15 days after March 9, when Manpower completed its investigation into Pollock's retaliation complaint and informed him that it did not substantiate his claims. (ECF No. 55, ¶ 100.) When so informed, Pollock expressed his dissatisfaction with Manpower's conclusion. (ECF No. 55, ¶ 101.) Through a combination of working from home, time off, and sick leave, Pollock was out of the office for the entire 15-day span preceding his transfer to the Accenture account. (ECF No. 55, ¶¶ 102, 103, 106, 107.) When he returned to the office, Pollock was informed of the transfer. (ECF No. 55, ¶ 108.) Thus, as a practical matter, Pollock's transfer came immediately after the completion of Manpower's investigation and Pollock telling Manpower he was unhappy with the company's conclusion.

However, "suspicious timing alone is rarely enough to survive summary judgment." *Morgan v. SVT, LLC*, 724 F.3d 990, 998 (7th Cir. 2013). Generally, there must be other evidence that supports the inference of a causal connection. *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). Here, there arguably is other such evidence—most notably, Manpower's admission that it transferred Pollock to the Best Buy account because of his complaints. If Manpower transferred Pollock once because of his complaints, it may be reasonable to assume that it might transfer him again because of his further complaints.

But negating this speculation are certain undisputed facts. Pollock was dissatisfied with the outcome of Manpower's investigation and said he did not want to work under Ellis anymore. (ECF No. 55, ¶¶ 101, 109.) Manpower says that, "[i]n order to keep Pollock and Ellis separated, [Manpower managers] arranged for Pollock to be transferred to the Accenture account and Ellis to be promoted." (ECF No. 55, ¶ 110.) Pollock purports to dispute this proposed fact, responding:

> Disputed on the basis that Ms. Ellis-Padberg was promoted in response to Mr. Pollock's discomfort with the idea of working with her after making his complaint, and Mr. Pollock was transferred to an unsuccessful account, Accenture. Mr. Pollock only agreed to this arrangement because he felt like he had no other choice.

(ECF No. 55, ¶ 110.)

Pollock's "dispute" does not respond to the point crucial to the proposed fact—why Manpower transferred Pollock. Pollock only offers his view as to why Ellis was

promoted. He proffers that the Accenture account was "unsuccessful," which is relevant (but insufficient, as discussed above) to whether the transfer was an adverse employment action. But it's not relevant to *why* he was transferred—that is, it is not relevant to causation. And although Pollock states why he agreed to the transfer, *his* motivation is not material. What matters is Manpower's motivation. On that crucial point, Pollock has failed to demonstrate that there exists any dispute that Manpower decided to transfer Pollock to the Accenture account to comply with his request that he no longer have to work under Ellis.

Consequently, a reasonable finder of fact could not conclude that Manpower transferred Pollock to the Accenture account in retaliation for his protected activity. Accordingly, Manpower is entitled to summary judgment on this portion of Pollock's claim.

## 4. Conclusion

It is undisputed that Pollock engaged in protected activity when he complained about directives from his supervisors to recruit only white candidates for certain clients. Although he has not presented evidence from which a reasonable finder of fact could conclude that he was fired or constructively discharged, there is evidence that his transfers resulted in a loss of pay. However, Pollock's transfer from the Dell account was not causally connected to his protected activity because there is no evidence that the managers who made the decision to transfer him knew of his protected activity. Nor is

there evidence that his transfer to the Accenture account was related to his protected activity. Pollock does not dispute that Manpower transferred him at his request to ensure he was no longer supervised by the person he believed was retaliating against him. However, Manpower admits that Pollock was transferred to the Best Buy account because of his complaints. Therefore, although Manpower is entitled to summary judgment on nearly all of Pollock's complaint, summary judgment must be denied as to Pollock's claim that he was transferred to the Best Buy account in retaliation for his protected activity.

**IT IS THEREFORE ORDERED** that Manpower's motion for summary judgment is **GRANTED IN PART**. It is granted with respect to his retaliation claims regarding Pollock's "termination" and transfer from the Dell account and transfer to the Accenture account. The motion is denied as to his retaliation claims regarding his transfer to the Best Buy account.

**IT IS FURTHER ORDERED** that Pollock's motion to file an amended response to Manpower's proposed findings of fact (ECF No. 53) is **GRANTED**.

Dated at Milwaukee, Wisconsin this 18th day of November, 2019.

WILLIAM E. DUFFIN
U.S. Magistrate Judge